**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **EIGHTEEN SEVENTY LP, MARIE KENNEDY FOUNDATION AND PAUL L. KENNEDY,**<br><br>                              Plaintiffs,<br><br>              **v.**<br><br>**STUART KINNEAR ROBERTSON, MICHÈLE FLEURY ROBERTSON, EAST PACIFIC GROUP LIMITED, CRUPE FOUNDATION, ANDREAS R. BIHRER AND BIHRER RECHTSANWÄLDE AG,**<br><br>                              Defendants. | Civil Action No.<br><br><br><br>**COMPLAINT** |

Plaintiffs Eighteen Seventy LP, Marie Kennedy Foundation and Paul L. Kennedy allege as follows:

<u>The Parties</u>

1.  Plaintiffs are United States persons.  Plaintiffs Eighteen Seventy LP ("Eighteen Seventy") and the Marie Kennedy Foundation beneficially invested in shares of CRUPE Pte. Ltd. ("CRUPE" or "the Company"), a company organized and existing under the laws of Singapore and headquartered in Zurich, Switzerland, and in debt of CRUPE and of its affiliate CRUPE Framing AG ("Crupe Framing").   Plaintiff Paul L. Kennedy and family also invested in debt of CRUPE.

2.  Plaintiff Eighteen Seventy is a limited partnership organized under the laws of Delaware, with its principal place of business in Big Horn, Wyoming.  Eighteen Seventy is a private investment partnership owned by plaintiff Paul Kennedy and siblings. Its business is

making decisions to invest and investing in stocks, bonds, commodities, futures and other investment instruments, including private equity.  It has no investors or customers.  Its business of investment decision-making is managed by, and requires the consent of its two partners, one of whom sits in Florida and participated in the decisions to invest in shares and debt of CRUPE as well as debt of Crupe Framing during the period 2012-2015, as enumerated in Paragraph 22, *infra*.

3.  Plaintiff Marie Kennedy Foundation is a private foundation formed under the laws of the State of Delaware, with its office in Big Horn, Wyoming.  As a private foundation, it has no public contributors.  It makes grants to qualified grantees from a pool of capital, which is invested to generate funds for grants.  The investment decisions of the Marie Kennedy Foundation are made jointly in Florida and Wyoming.  As a result of such investment decisions, the Foundation purchased shares and debt of CRUPE and debt of Crupe Framing, as enumerated in Paragraph 22, *infra.*

4.  Plaintiff Paul L. Kennedy and family reside in Key Biscayne, Florida, in the Southern District of Florida.  As a result of the investments of Eighteen Seventy in the securities of CRUPE and subsidiaries, Mr. Kennedy became of a member of the Board of Directors of CRUPE in 2014.  He and his family purchased $200,000 of interest-bearing notes of CRUPE, as enumerated in paragraph 22, *infra.*

5.  Defendant Stuart Kinnear Robertson ("Robertson"), described as a "pathological liar" by a former colleague, is a citizen of Australia and of Switzerland and is a resident of Switzerland.  Currently he manages a commercial entity called Giffries, which is housed in the offices of defendants Andreas R. Bihrer and Bihrer Rechtsandwalde AG, and

which purports to have investments in TAP Energy, VitaSalts, VyeHome and VyeMedia, and falsely promotes on its website Giffries' investment in CRUPE. Robertson is the founder of CRUPE. He served as a Director and Chief Executive Officer of CRUPE from its founding in approximately 2010 until 2015, and he was a director and officer of Crupe Framing, which issued debt to plaintiffs Eighteen Seventy and Marie Kennedy Foundation. For part of that period, he also beneficially controlled CRUPE and its subsidiaries. In those capacities Robertson had disclosure duties to CRUPE, its investors, as well as to Crupe Framing debtholders. Among other things, Robertson had a duty to disclose to plaintiffs the true state of CRUPE's condition, his pre-existing plan to steal CRUPE assets, and their eventual theft.

6. Defendant Michèle Fleury Robertson ("Fleury") is a citizen of Switzerland and resident of Switzerland, and at all relevant times was Robertson's wife and the Chairperson of defendant CRUPE Foundation. Fleury had a disclosure duty to plaintiffs as a result of her active participation in the theft of CRUPE assets and as a direct beneficiary of the fraud described herein.

7. Defendant East Pacific Group Limited ("East Pacific") is a holding company owned and controlled by defendant Robertson, and is domiciled in Hong Kong. Upon information and belief, Robertson with the active assistance and participation of Fleury, used East Pacific to function as his own management company in order to conceal his compensation as a Swiss employee of CRUPE and thereby evade personal income taxes in Switzerland despite the fact that he was living and working in Switzerland during the relevant time, with the result that he declared only 130,000 Swiss francs on his tax returns. East Pacific was and is the alter ego of Robertson and Fleury, and it is liable for any claims against them. In entering into a management agreement with CRUPE dated January 1, 2011, East Pacific acquired by the terms

of the agreement its own fiduciary duty to the Company and its investors and was obligated to avoid any conflict of interest with them, and thereby to disclose to plaintiffs the true state of CRUPE's condition as described herein.  (Robertson and East Pacific are together referred to herein as "Robertson.")

8.  Defendant CRUPE Foundation is organized under the laws of Switzerland and is headquartered in Switzerland.  It has engaged with the U.S. Patent and Trademark Office to maintain United States patents covering technology described in Paragraph 14, *infra*.  Upon information and belief, it was established by and has been and is under the control of Robertson and Fleury.  They, together with defendant Andreas R. Bihrer, are the sole Trustees of the CRUPE Foundation.  The CRUPE Foundation was and is an alter ego of Robertson and Fleury.

9.  Defendant Andreas R. Bihrer ("Bihrer") is an attorney practicing in Zurich, Switzerland.  Bihrer purports to be a reputable member of society, active in international polo and in rowing circles (as a former Olympic rower), and in the guilds.  Since CRUPE's inception, Bihrer effectively took on the role of General Counsel of the Company and its subsidiaries, and also acted as Secretary to the Board of Directors of CRUPE, imposing upon him disclosure duties with respect to CRUPE and its shareholders, as well as debtholders of Crupe Framing.  Among other things, Bihrer had a duty to disclose to the plaintiffs his active participation in the defendants' pre-existing plan and theft of CRUPE assets; as well as his active representation of other defendants, even when their interests conflicted with the interests of CRUPE and its investors.

10.  Defendant Bihrer Rechtsanwälde AG ("Bihrer Law Firm") is a law firm headquartered in Zurich, Switzerland.  It provided substantial and continuous legal services to

CRUPE and other defendants, and it participated actively in the wrongs alleged herein.  It is, upon information and belief, the alter ego or employer of defendant Bihrer, and is liable for any claims against him.  The Bihrer Law Firm had the same duties as Bihrer, including a duty to disclose the defendants' pre-existing plan and theft of CRUPE assets and egregious conflicts of interest.  (Bihrer and Bihrer Law Firm are together referred to herein as "Bihrer.")

## Jurisdiction

11.  This Court has jurisdiction over this action because it sets forth claims of securities fraud in violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa and Rule 10b-5, 17 C.F.R. § 240.10b-5.  15 U.S.C. § 78j(b).  This Court also has jurisdiction over this action because it is between citizens of a State and citizens or subjects of a foreign state.  28 U.S.C. § 1332.

12.  There is personal jurisdiction over the defendants because they engaged in a broad and far-reaching conspiracy, during the course of which they or persons acting in concert with them and on their behalf, or persons acting under their direction and control conducted, engaged in and carried on business within the State of Florida  and caused injury to the plaintiffs within the State of Florida arising out of acts and omissions by the defendants outside the State of Florida when, at the time of the injury, the defendants were engaged in solicitation activities within the State of Florida.   They engaged in a pattern of continuous offerings of securities in the State of Florida and elsewhere in the United States, amounting to at least nine offerings totaling over $60,000,000, of which nearly $11,000,000 was purchased in the Southern District of Florida pursuant to the defendants' securities offerings.  Upon information and belief, the

defendants took the following actions in connection with their solicitation and sales of securities to the plaintiffs during the period from 2012 through 2015:

      a.    Robertson, Fleury, Bihrer and others acting under their direction and control transmitted hundreds of communications by mail and email to the plaintiffs in the State of Florida and elsewhere in the United States from 2011 through 2015;

      b.    Robertson and Bihrer and others acting under their direction and control engaged in dozens of telephone and other oral and electronic communications with the plaintiffs in the State of Florida between 2011 through 2015; and

      c.    Robertson and Bihrer conducted numerous meetings of the Board of Directors of Crupe in Florida by telephone, during which the conspiracy of fraud and concealment described herein was further effected.

13.  As detailed below, Robertson, Fleury, Bihrer and the CRUPE Foundation intentionally participated in a corrupt agreement, and in furtherance thereof engaged in overt acts to injure plaintiffs.

<u>Summary of the Complaint</u>

14.  CRUPE was founded to develop, market and sell a unique building material throughout the world. The material is created by combining a proprietary CRUPE additive with gypsum and cement that causes them to bind.  The material can then be mixed with expanded polystyrene or perlite to create what was claimed to be an environmentally, seismically,

thermally and acoustically superior building compound that is lighter than other building materials with the added benefit of being fire-retardant.

15.   The proprietary CRUPE additive was acquired from its inventors and is protected by patents issued in the United States and foreign countries.  They along with the related expertise and registered trademarks constitute the intellectual property of CRUPE IP GmbH, formerly a subsidiary of CRUPE.  The patents are the most valuable part of CRUPE's intellectual property ("IP") and have been the most valuable, and nearly the exclusive asset of the Company.  According to the defendants' own appraisal, this IP is unique and worth $100,000,000.

16.   Beginning in around 2011, Robertson sought funding to develop CRUPE's products based upon its IP and to market them.  To raise capital for CRUPE, and to sustain what became a lavish lifestyle for Robertson and Fleury,  the defendants deceived the plaintiffs through false representations and omissions of material facts, the object of which was to portray the assets, operations and prospects of CRUPE in a glowing and favorable light.  The false representations and omissions were intentional or in reckless disregard for the truth, and were made in connection with the offer and sale of securities to the plaintiffs.    Robertson mismanaged the Company to such an extent that it suffered staggering losses, despite repeated assurances to the investors that it would become successful, with the result that he and the other defendants had to resort to raising even more capital, amounting to $65,000,000 to keep CRUPE afloat.  As part of their fraudulent conspiracy, Robertson and the other defendants not only made numerous false representations and omissions of material fact to the plaintiffs, but also did not disclose to them the defendants' pre-existing plan to steal the CRUPE IP by transferring it to their CRUPE Foundation for their own private gain and to fund their extravagant lifestyles.  To

succeed in their conspiracy, the defendants continued to make false representations and omissions of material facts to raise more money from the plaintiffs and other investors and lull them into a false sense of security with respect to their investments.

17. Defendants engaged in a continuous course of concealment of their misrepresentations, omissions and fraud, including of their *scienter,* which plaintiffs discovered in 2015 and as late as October 2016, when defendant Bihrer testified that since early 2011 it was the intention and pre-existing plan to transfer the IP to a foundation, stripping it out of CRUPE.

<u>Fraud in the Inducement</u>

18. Robertson and Bihrer first induced Eighteen Seventy to purchase CRUPE A-1 Preference shares in February 2012 by sending it an information memorandum ("Information Memorandum") that falsely portrayed CRUPE as an established, fast-growing company with worldwide sales, supposedly bursting at the seams with unlimited prospects. The defendants had deliberately or with reckless disregard for the truth prepared the Information Memorandum to contain numerous false representations or omissions of material fact, including the following, among others:

      a.      The representation that the CRUPE additive material was "fully developed and commercialized," when it was not but cracked when applied, and failed when mixed with certain gypsums in key applications promoted by the defendants;

      b.      The representation that the product can be used for external walls and in humid climates, without reservation, when in fact it cannot be;

c.      The representation that when mixed with synthetic gypsum, the product suffers "no deterioration," when the chloride and PH levels present in synthetic gypsum make the product significantly unusable with synthetic gypsum;

d.      The representation that the technology has European Union ("EU") certification known as "CE," when CRUPE has no such certification to this day and can therefore not sell the product anywhere in the EU;

e.      The representation that "[t]he business is generating cash . . . . ," when in fact the business was burning cash at a rapid rate;

f.      The representation that gross and net margins were 300% and 600%, when margins resulting in the sale of the product were far less;

g.      The representation that, "the order book is growing rapidly across multiple regions . . . . ," when in fact the "order book"—meaning booked sales— was not growing rapidly, and sales have been minimal even to this date;

h.      The representation that "[i]t is difficult to accurately predict revenues beyond 2013 . . . . ," intended to give the impression that revenue projections through 2013 were accurate, when they were wildly inaccurate and deliberately fraudulent;

i.      The representation that there is "extensive worldwide demand" for the product, when in fact there was—and to date has been—no such demand;

j.      The representation that "revenues are expected to exceed EUR 20 million in 2012 and there are reasonable expectations of revenues exceeding EUR 100 million in 2013-14," when there was no such expectations, and revenues turned out to be only $466,000 in 2012, $1,000,000 in 2013 and $1,100,000 in 2014;

k.      The representation that estimated revenues would be $18,000,000 and operating cash flow would be $5,000,000 in 2012, and estimated revenues would be $61,000,000 and operating cash flow would be $40,000,000 in 2013, when revenues were minimal, and operating cash flows were substantially negative;

l.      The representation that revenues for 2010/2011 were $345,000, when, upon information and belief, they were less than half of that;

m.      The representation that "central salaries and business related expenses" in 2010/2011 had been $1,700,000, when Robertson was paying himself and his management company East Pacific $1,000,000 per year plus an additional "bonus" of $1,800,000 to East Pacific and $1,200,000 to his associates, when that total compensation was rapacious, given the Company had minimal revenues and negative cash flow;

n.      The representation that overhead expenses were $9,000,000, when they were actually approximately $15,000,000;

o.      The representations under the headings "Contractual Counterparty" and

"Contract Volume 2011-2012" that reflected contracts for the construction of hundreds of thousands of houses, when few, if any, such contracts existed;

p.        The representation that there was $53,880,000 worth of "committed" contracts, when the Company had few if any such contracts;

q.        The representations that there was $866,253,000 worth of "potential" contracts of which the Company was "very confident," or that the contracts were "pending only final formal certification," when in fact there was no reasonable basis for such representations, given that contracts actually completed during the period from 2011-2015 amounted to only $3,000,000;

r.        The representation that the Company will "launch high profile projects in China…St.Lucia…Italy…Morocco…Thailand…Philippines…Argentina …Chile…Uruguay followed by a wide range of other projects in and around South America, Asia (including India and Pakistan), the middle east and Africa—currently all on track to be delivered in the next 12 months," when few if any of those projects would begin or be completed as promised "in the next 12 months" or, in fact, ever;

s.        The representation that there were only two "Key Risks"—product liability and competitors copying the technology—to the investments when there were other serious and material risks not disclosed, including: risks of fully developing the product; risks of getting to market due to

barriers to new markets and regulatory hurdles; risks of developing

sufficient revenue to support the Company; risks of excessive and

uncontrolled expenses; risks of exhausted capital and need for additional

financing; risks of the repudiation of contracts in developing markets; and

risks due to conflicts of interests, personal aggrandizement, waste of

corporate assets, theft of corporate assets, incompetent management, and

the loss of exclusive rights and title to the Company's IP;

t.      The representation in projections attached to the Information

Memorandum that there would be hundreds of millions of sales and

earnings in a few years, when the projections were not realistic or

reasonable;

u.      The representations regarding the accuracy of the balance sheet and

income and cash flows, which were materially false and misleading;

v.      The omission to disclose the existence and terms of the management

contract with East Pacific, Robertson's management company, and other

management contracts, which committed CRUPE to pay $3,000,000 in

signing bonuses in January 2012, and the fact that Eighteen Seventy's

investment of approximately $3,000,000 investment would be used for

that purpose, rather than to develop the business of CRUPE;

w.      The omission to disclose that there were no reasonable or customary

restraints on the authority of Robertson to remove funds from the

Company;

x.   The representation that Robertson helped "develop and manage complex businesses around the world," when, upon information and belief, he had previously had only limited business experience as a staff employee working on tax matters, not as a manager starting and running any significant business;

y.   The representation that Robertson was a partner of Accenture PLC, the global professional services company, when he was an employee with no equity in the firm and had actually been fired or forced to resign because of his attempt to steal a major client of that firm; and

z.   The omission to disclose that Bihrer, while purporting to act as CRUPE's principal legal advisor and performing legal services for it and its subsidiaries, was also acting as the personal lawyer for Robertson, East Pacific and other entities owned and controlled by Robertson and Fleury, with the result that his representation of the Company and its subsidiaries was unethically compromised by flagrant conflicts of interest, as reflected by his participation in the pre-existing plan to remove the IP from CRUPE.

19.   Robertson and Bihrer made the following critical representations in the aforementioned Information Memorandum, as well as in a Subscription Agreement and an Investment Agreement (together "Subscription Documents"):

a.   The representation in the Information Memorandum that CRUPE, the Singapore parent company in which plaintiffs invested, owned through

subsidiaries the patented technology on which the CRUPE business was based;

b.       The representation in the Subscription Agreement that CRUPE was the indirect owner of 100% of the shares of the owner of the IP, and that the Company was taking all steps to protect its intellectual property; and

c.       The representations in the Investment Agreement that "the Company [CRUPE] has been provided all the technology, patents and intellectual property rights associated therewith (the 'IP'), which it uses for its business on an irrevocably [sic] and exclusive basis by the inventors thereof.  It is the agreement with the inventors that all the IP will be held, registered, maintained and developed by the Company and its subsidiaries henceforth as owner of the IP;" and that the Company is taking all steps to protect the IP.

20.  Defendants made no disclosure in the Subscription Documents or otherwise in connection with the offer and sale of securities to plaintiffs that they already had agreed on a pre-existing plan and scheme to steal the IP by transferring the shares of the CRUPE subsidiary which held the IP to the CRUPE Foundation, which would be controlled by Robertson and his wife Fleury, thereby rendering plaintiffs' shares and debt of the Company and its subsidiaries effectively worthless.

21.  In February 2012, relying on the preceding false representations and omissions of material fact, Eighteen Seventy invested $3,313,000 in CRUPE A-1 Preference Shares.

22.   On the following dates, again relying on the preceding false representations and omissions of material fact, as well as additional false representations and omissions made in connection with defendants' subsequent offers and sales of securities described below, the plaintiffs made the following investments:

a.      In July 2012, Eighteen Seventy invested $1,800,000 in CRUPE A-1 Preference Shares;

b.      In October 2012, Eighteen Seventy loaned CRUPE $2,000,000 in effect by providing security for a credit facility with UBS;

c.      In September 2013, Eighteen Seventy invested $500,000 in CRUPE A-1 Preference Shares, and the Marie Kennedy Foundation loaned $420,000 to Crupe Framing and invested $150,000 in CRUPE A-1 Preference Shares;

d.      In December 2013, Kennedy and family loaned $200,000 to CRUPE;

e.      In May 2014, Eighteen Seventy invested $1,000,000 in CRUPE A-1 Preference Shares;

f.      In October 2014, Eighteen Seventy loaned CRUPE $700,000 in effect by providing additional security for the above-mentioned credit facility with UBS;

g.      In November 2014, Eighteen Seventy invested $300,000 in CRUPE A-1 Preference Shares;

h.      In May 2015, Eighteen Seventy loaned $200,000 to CRUPE;

i.      In April 2016, Eighteen Seventy loaned $70,000 to CRUPE; and

j.      In July 2016, the Marie Kennedy Foundation loaned $35,000 to CRUPE.

Continuing False Representations & Omissions

23.  Continuing their conspiracy, which began in 2011, defendants provided the plaintiffs in connection with their offers and sales of securities with financial and other statements, upon which plaintiffs relied, that contained additional false representations and omissions of material fact that were deliberate or made in reckless disregard for the truth to induce them to invest more money by purchasing shares or loaning money to CRUPE and its subsidiary Crupe Framing.  The false representations and omissions included the following, among other things:

a.      Both before and after the plaintiffs made their investments, Robertson prepared and distributed numerous financial statements, upon which the plaintiffs relied, which contained false and misleading information concerning balance sheet entries, cash flows and profit.

b.      In the spring of 2012, Robertson prepared and distributed a document purporting to be an "order book" for the construction of more than 2,000 houses in Argentina, when no business of any size was ever conducted or could reasonably expected to be conducted in Argentina.  He prepared and distributed another intentionally deceptive "order book" for the construction of 3,600 houses in Uruguay, when zero revenue was received from Uruguay in 2012 and 2013.

c.     At about the same time, Robertson published and disseminated a "Cash Flow Forecast" for 2012 showing over $10,000,000 in sales for the fourth quarter of 2012 and another $60,000,000 in sales for all of 2013, when he knew full well that there was no reasonable basis for such forecasts. He published another forecast showing $67,000,000 in sales for all of 2012 and another $126,000,000 for 2013, when he knew full well that there was no reasonable basis for such forecasts. The actual total sales for 2012 were only $466,000 and for 2013 only $1,000,000.

d.     In June 2012, Robertson prepared and distributed a report representing that two prominent Brazilian companies had "begun the ground works for the new [CRUPE Framing] factories," when he had no reasonable basis to believe that Crupe Framing factories would ever be constructed. The report also represented that the Company "will shortly deliver 75" rollformers in Chile, when in fact the Chilean customers had ordered no more than four.

e.     Also in June 2012, Robertson prepared and distributed a report representing: "In Brazil, Argentina, Uruguay, Chile and Peru we have new orders to supply thousands of new homes and schools. In the Philippines and Thailand as well and in China we support numerous high rise projects (with our fire render system) . . . ." There were no orders in hand for thousands of homes and schools, and, even to date, there have been zero sales of the fire render system.

f.    In July 2012, Robertson represented that in China "the initial stage of 1,000 unit projects are starting in October," when in fact no such projects were in hand or ever started.  There was zero revenue for operations in China in 2012 and a mere $9,000 in 2013.

g.    Also in July 2012, Robertson prepared and distributed a report representing that "millions of units" are being discussed with "a small partner community" in Brazil, and that a private contractor had "500-1000 units committed to CRUPE," when he knew there was no real prospect for millions of units or a firm commitment for 500-1000 units.  There was zero revenue for operations in Brazil in 2012, and a mere $114,000 in 2013.  In addition, Robertson included a false representation in a footnote entitled "Order Focus":  "BraCana [a company in Brazil] 405 homes," suggesting that 405 homes were on order.  There was no such order.

h.    In September 2012, Robertson prepared and distributed a report that deceptively suggested that a large order for units was secured or imminent, by reporting that the Company was working with the Henan Government "**to produce the first houses for a project of 6-8 million new units**," and working with the Railroad Commission **to build the first of 1,000 houses**" [emphasis in original], when he knew there was no such order for millions or even thousands, nor would there be.  In fact the Company's products had not been certified in China, and no units were ever built.

i.    In March 2013, Robertson prepared and distributed to the investors an

updated "Information Memorandum," for investors, which upon

information and belief was reviewed and approved by Bihrer, who at that

time had already transferred the IP out of CRUPE and into the CRUPE

Foundation, and failed to disclose that to plaintiffs and other investors.

Further, in the new Information Memorandum, Robertson and Bihrer

falsely represented that "the business is already generating cash flows and

the order book is growing rapidly across multiple markets."  In fact the

Company was not generating cash—it actually lost $16,000,000 in 2013—

and the orders on hand were minimal.  The defendants disclosed only two

risks in a section entitled "Key Risks":  product liability (for which the

reader was assured there was insurance coverage) and competition from

others.  However, as the defendants well knew, the risks to the business

were multiple and substantial, as set forth above.  The memorandum

characterized projections as "very conservative," when Robertson and

Bihrer knew the projections were not conservative but false and deceptive.

The memorandum included a section entitled "Management salaries and

business related expenses," with the claim that management had

temporarily foregone some salary while not disclosing that Robertson had

taken a $1,800,000 bonus for the benefit of him and Fleury, and paid other

colleagues bonuses of $1,200,000.  The defendants repeated many of the

false representations and omissions in their 2012 Information

Memorandum, as set forth in Paragraph 18, *supra*, in this 2013

Information Memorandum.

j.      In June 2013, Roberson emailed plaintiffs with the "news" that CRUPE was planning to "sign a number of major contracts in …Bolivia and China and possibly Brazil" in July and August, when defendants knew or had reason to believe that no such contracts would be finalized or completed. In fact, they were not.

k.      In July 2013, Robertson again emailed the plaintiffs with the "news" that in Brazil "we have committed orders from one customer . . . to run steel for 500 houses," when he knew or had reason to believe that the customer had not given a binding commitment.

l.      In August 2013, Robertson prepared and distributed cash flow statements assuring that "all versions of the Cash Flow Forecasts are somewhat conservative—we have included only identified/committed projects," when he had included uncommitted projects in the forecasts to overstate the cash prospects of the Company.

m.      Also in August 2013, Robertson emailed the plaintiffs with the "news" that in Bolivia the company had "closed . . . [an] order using CRUPE technology [for] 8,000 houses," when there was no closing because the order was highly conditional.  Total revenues for Chile combined with Bolivia for the two-year period 2013-14 were only $227,000.  Robertson compounded the falsity of their representation by asserting "the problem with the forecasts is that they don't tell the full story as . . . not all the likely contracts and furthermore some of the larger ones . . . are not yet

included."

n.      In September 2013, Robertson reported:  "We currently have our
machines producing buildings for the Central Government in Beijing, in
Brazil at for eg  the Olympic site (Athletes Village)".  As Robertson well
knew, the Company was not performing any real work for the Chinese
Government, and it had only conducted a demonstration at the Athletes
Village at the Brazilian Olympics.

o.      In November 2013, Robertson prepared and distributed a forecast of
$167,000,000 in sales for 2014, while in fact total sales resulted in only
$1,000,000.  Robertson knew that this forecast was false and deceptive
because he had internal forecasts showing many millions less in sales.

p.      In November 2013, Robertson gave a presentation in which he falsely
touted that the CRUPE technology could be used in combination with
other materials, specifically bamboo, which would be a major
development for ecology as well as cost savings in Asia.  He then falsely
represented that CRUPE had already "completed all testing of materials
successfully and [was] working on enterprise standards . . . including the
new bamboo/steel hybrid structures."  To this day, it has not been
established that bamboo can be used with the CRUPE technology.

q.      In the preceding presentation, Robertson boasted about the "growth" of
CRUPE in 2014 to 2,000 houses under contract in Brazil, when there were
few houses under contract.  Robertson also claimed that CRUPE has

"signed contracts for the first 360 homes to be built in 2014" under a labor union housing program in Uruguay without disclosing the serious risks in conducting that business, which was in fact derailed.  The total revenue for operations in Uruguay for the two-year period 2013-2014 was only $100,000.

r.      In December 2013, Robertson wrote to shareholders, with upon information and belief, the approval of Bihrer, boasting about the Company's ability to meet the market price for building social housing in China, while they knew or had reason to believe that was not possible.  No such housing in China has ever been built, and the Company's product was not then certified in China.  Those defendants also claimed that CRUPE was starting a prefab building project in Brazil with "the first deliveries of CRUPEPRE_FAB homes [to] begin in 2014," when in fact they knew or had reason to know that the Company was not devoting sufficient resources to the project and would be unable to deliver.  In the same message, they falsely claimed there was $4,000,000 worth of orders for Brazil.  The total revenue for business in Brazil for 2014 was only $688,000.  They also made a misleading claim about business in Bolivia: "[O]ur . . . customer has signed orders for 8,000 homes" without disclosing the material contingencies, which have led to essentially zero business in Bolivia.

s.      In December 2013, Robertson emailed the plaintiffs and other investors, with upon information and belief, the approval of Bihrer and Fleury, to

give them false confidence in the future prospects of the Company by falsely claiming: "The management and majority shareholders have just invested a further $5,000,000 in the company." Robertson, with upon information and belief, the approval of Bihrer and Fleury, later made a similar claim that Robertson had himself invested $5,000,000 in the Company, suggesting he was raising his personal stake. In fact, the invested funds were provided by a third party.

t.    In January 2014 and thereafter, Robertson and Bihrer failed to disclose to the plaintiffs and other investors material facts relating to the Itlania acquisition, including that Bihrer had a blatant conflict of interest. While supposedly representing CRUPE, Bihrer was actually representing the interests of Robertson and his management company East Pacific. As Bihrer knew and as he and Robertson failed to disclose, Robertson had previously purchased Itlania through East Pacific and then bound CRUPE to an unconditional contract to buy Itlania at a 1,100% mark-up only a year later.

u.    In January 2014, Robertson falsely reported that the Company had "signed" contracts in Brazil of $5,600,000, when such contracts, if they existed, were highly conditional; Brazilian business in 2014 resulted in only $688,000 in revenue.

v.    In March 2014, Robertson sent an email to a third party, with a copy to Eighteen Seventy, with the false and exaggerated claim: "Today we have

an order book in excess of $600,000,000." There were no such orders, committed or otherwise.

w.     In March 2014, Robertson distributed to Eighteen Seventy and other investors an order book falsely reflecting $61,000,000 of "committed (scheduled)" orders, including $6,000,000 obtained by a subsidiary CRUPE do Brazil. He well knew or recklessly disregarded the fact that the Company would never complete this amount of orders as evidenced by the fact that it recorded only $1,000,000 of revenue for the entire company, of which $688,000 came from Brazil.

x.     In March 2014, Robertson sent—with Bihrer's approval and involvement—the plaintiffs and other investors the above-mentioned January 2014 Information Memorandum. It contained an additional false representation, showing a schedule of orders amounting to $83,000,000, and total orders including pipeline orders of $600,000,000, when there was no reasonable basis for those numbers.

y.     In or about March 2014, Robertson prepared and distributed, with upon information and belief, the active and knowing involvement of Bihrer, a "First Quarter Report" to investors in which they made the false representation that the order book had increased to $610,000,000, of which $72,000,000 was "Committed (Scheduled)." None of these numbers were accurate, as they well knew or had reason to know.

z.     In April 2014, Robertson sent an email to Eighteen Seventy in which he

stated:  "We just got the order from the Bolivian Gov. for the next 50 houses . . . now that we have completed the test 2. They identify 150 after that . . . ten lots of annually 1,000 . . . ."  In fact that order was never finalized because it was based on material conditions that were not disclosed.

aa.   In April 2014, Robertson prepared and distributed a "Shareholders Report," which upon information and belief was reviewed and approved by Bihrer, as an integral part of still another offering of CRUPE securities, in which they falsely represented:  "We now have a number of larger orders signed up in China, Brazil and Uruguay awarded on the back of smaller pilot project . . . ."  No such orders had been finalized.  The securities offering, like the others made to Eighteen Seventy and other investors, contained additional false representations and omissions, including but not limited to undisclosed risks to the business, the size of the order book, the Company's cash flow, and the fact that the Company's IP, which represented substantially all of the Company's assets, had already been stolen from the Company and transferred to the CRUPE Foundation, which was controlled by Robertson and Fleury.

bb.   At the same time, in April 2014, Robertson prepared and distributed more false projections claiming a "base (slim) case based on orders confirmed in Brazil and China" for $5,000,000 in sales for 2014 and $18,000,000 in sales for 2015 just "based on contracts in hand."  Upon information and belief, CRUPE'S Chairman had directed him to prepare projections based

only on "committed and signed" contracts.  Robertson did not do so but instead gave projections that he knew to be false, or recklessly disregarded the truth thereof, and that would not materialize.

cc.     In May 2014, defendant Robertson prepared and distributed a forecast of $74,000,000 in total revenue for 2014, based on a supposedly "conservative case" when he knew there was no reasonable support for it.

dd.     In May 2014, Robertson emailed the plaintiffs and other investors:  "The outlook for the business has actually improved since December . . . there has been a shift in the timing but not a shift in the outlook."  This statement was false and deceptive, as he well knew, because the outlook had not improved.

ee.     In May 2014, Robertson again falsely asserted that he, as Chief Executive Officer, had  "just months ago . . . invested $5,000,000," a statement made to mislead the shareholders into believing that he had faith in the Company's future and to lull them into a false sense of security.  As indicated above, he had not invested his own money, and upon information and belief, Fleury and Bihrer knew that and further conspired with him to continue deceiving plaintiffs and other investors.

ff.     Also in or about May 2014, Robertson falsely represented that the "slim case" or conservative projections for sales for that year would be $9,000,000 and for 2015 $33,000,000.  He deliberately and falsely projected cash balances of nearly $6,000,000 for 2014 and nearly

$15,000,000 for 2015, with resulting net income of $2,500,000 and $7,000,000 respectively.  This forecast was supposedly based "on the committed order book (and further phasing in 2015) . . . ."  However, as Robertson well knew, based on his intimate knowledge of the actual state of the Company's business, sales would be negligible, cash balances minimal, and net income non-existent.

gg.  In June 2014, Robertson falsely increased his "slim case" or conservative projections for sales to exceed $7,000,000 in 2014 and $30,000,000 in 2015.  Sales, as he well knew and expected, would be and were minimal for both years.  At the same time Robertson prepared and distributed an order book falsely representing more than $46,000,000 in "Committed (scheduled)" orders for China and $6,000,000 for Brazil.  Those orders did not exist.   The total revenues for the Company's business in China were zero for the two-year period 2014-2015 and less than $1,000,000 for business in Brazil.

hh.  In July 2014, Robertson with, upon information and belief, Bihrer's involvement and approval, prepared and distributed to the plaintiffs and other investors a July 2014 Information Memorandum, supposedly updating the original Investment Memorandum, the 2013 Investment Memorandum and the January 2014 Investment Memorandum. The July 2014 Investment Memorandum, disseminated in connection with the offer and sale of securities, contained substantially the same materially false statements and omissions as the earlier versions.

ii.      In or around July 2014, Robertson with, upon information and belief, Bihrer's involvement and approval, then prepared and distributed a "Second Quarter 2014 Highlights Report" to the plaintiffs and other investors.  In it those defendants made the assertion, which they knew or had reason to know to be false, that the new Crupe Framing steel roll former machine was "a Ferrari compared to a Volkswagen."  They repeated this boast in an updated report they sent to Eighteen Seventy in September and added the further false claim that "customers are lining up to use these machines in projects around the world."  In fact, as they well knew or had reason to believe, the roll former machines repeatedly broke down, resulting in damage to the Company's and Crupe Framing's reputation and business, and as a result there was no large customer demand.

jj.      In September 2014, Robertson prepared and distributed a "Business Update," falsely asserting that "this month more than 250 houses have been confirmed to start production later this year financed by the Chilean and Uruguayan governments."  No such confirmation had been given, and no houses were ever built.

kk.      In the same September 2014 report, Robertson falsely represented that "CRUPE has been accepted as the product of choice in Brazil (in fact companies now specify CRUPE as the product standard for building contractors.)"  In fact, CRUPE product had not then been certified as an authorized building material in Brazil.  Further, upon information and

belief, Brazilian contractors had not accepted CRUPE product as product of choice or the standard, as confirmed by the later paltry revenues received from Brazilian business.

ll.      In October 2014, Robertson falsely reported:  "We now have signed orders now for many hundreds of houses . . . and there is no reason why this trend should not continue into thousands of homes . . . ."   In fact there were no such signed orders, or if signed, they came with significant conditions.  He also falsely reported that Odebrecht, the largest construction company in Brazil, "decided to switch from KNAUF inside wall board solution to CRUPE's for future projects in Rio de Janeiro . . . [and] in China we have started to win large Gov't linked projects . . . ."  The only business the Company actually had was a limited amount from one business unit of Odebrecht that lasted for short time, and the Company had not won any large Chinese Government projects.

Theft of the CRUPE IP and Continuing Fraud

24.  In purchasing CRUPE shares and loaning money to the Company and its subsidiary Crupe Framing, plaintiffs relied upon the representations, warranties and commitments set forth in the Subscription Documents.

25.  Notwithstanding the representations, warranties and commitments in the Subscription Documents, Robertson, Fleury and Bihrer further defrauded the plaintiffs by not disclosing, in connection with their offers and sales of securities to plaintiffs, the material fact of their conspiracy and pre-existing plan to steal CRUPE's IP, its primary asset, by transferring the

shares of CRUPE IP, the CRUPE subsidiary in which the IP was held, to the CRUPE Foundation for no consideration.  Specifically, the defendants failed to disclose the following material acts in furtherance of their conspiracy to deceive plaintiffs into investing in CRUPE and its subsidiaries:

a.   Despite the representation in the original Investment Agreement that the inventors of the IP had transferred it the Company for its exclusive use "henceforth," Robertson, Fleury and Bihrer intended from the beginning to steal the IP and did so by executing a "transfer agreement" on or about January 11, 2013.

b.   Despite being aware of Robertson's and Bihrer's fiduciary obligation to keep the IP as the primary asset of the Company or, if it were to be sold, to obtain the best possible price for it, defendants stole the IP—which they valued as being worth $100,000,000—by transferring it to the CRUPE Foundation for no consideration.

c.   Despite being aware of their fiduciary obligation to not waste corporate assets, Robertson, Fleury and Bihrer, with the assistance of the CRUPE Foundation, also wasted CRUPE assets by transferring $100,000 to the CRUPE Foundation.

### The Crupe Framing Fraud

26.  In or about June 2013, Robertson, acting in concert, upon information and belief, with Bihrer, approached Eighteen Seventy and the Marie Kennedy Foundation to solicit

their investment in what they represented were secured loans to Crupe Framing, a special

purpose subsidiary formed to hold title to machines called "rollformers." Rollformers are

machines into which blank rolls of steel are fed, in order to be molded and cut to produce

building frames. They are put out on contract to customers who pay a royalty on each meter of

steel formed by the machines. To further induce Eighteen Seventy and the Marie Kennedy

Foundation to provide Crupe Framing with financing, Robertson prepared and provided an

analysis indicating the number of rollformers in the field, the contracts for their use, and the

royalties to be generated. Robertson assured the plaintiffs that the loan proceeds would be

applied to the purchase of rollformers and that the royalties therefrom would be put into escrow

and paid directly to the investors. He further encouraged investment by representing that it

would enable Crupe Framing to put more rollformers into the field and increase CRUPE's

overall business.

27. To induce Eighteen Seventy and the Marie Foundation to invest in the Crupe

Framing secured debt, Robertson made with, upon information and belief, the assistance of

Bihrer, the following false representations and omissions of material facts, upon which such

plaintiffs relied in making their investment decisions, including:

     a.     The omission to disclose that they had already stolen the CRUPE IP and

            transferred to the CRUPE Foundation, as explained above;

     b.     The representation that Crupe Framing was a special purpose corporation,

            when it was actually an operating subsidiary losing hundreds of thousands

            of dollars per year;

     c.     The representation that there were already contracts in place for the

rollformers with an expected stream of royalty payments, when upon information and belief, many of the rollformers were not under fixed contracts, and resulting royalty payments were speculative and actually never materialized;

d.      The omission to disclose that some of the rollformers and related software had numerous design flaws that rendered unreliable or unable to function as advertised;

e.      The representation that "Bolivia will require between 4 and 6 machines to produce 32 towers for Police Force," when a contract for such towers had not been signed;

f.      The representation that "we should have a minimum of 15 machines in place here in Brazil (based on current orders/negotiations) and those machines should be ordering minimum $25,000 per month in license fees . . . 8-10 more machines (a minimum) we will sell here this year . . . CRUPE Brazil will be profitable in 2013 . . ., " when they knew or had reason to know those numbers were false;

g.      The representation that credits would be generated (as enumerated) by each of fifteen specified customers in Brazil when the company did not have fifteen rollformer customers in all of Brazil;

h.      The representation that the "pool" of potential lessors for the rollformers was "now up to 29," when they knew or had reason to know it was

unreasonable to speculate there were that many; and

    i.    The representation that the plaintiffs' investment in the debt would be secured, when Robertson and Bihrer did not intend to take reasonable steps to cause to be signed or implemented the escrow agreement for the royalty payments or cause to be perfected the plaintiffs' security interest in the rollformers.

28.  After obtaining Eighteen Seventy's and Marie Kennedy Foundation's investment in the Crupe Framing loans, Robertson with upon information and belief, the assistance of Bihrer, failed to disclose that they had diverted the loan principal and the royalty payments to fund other operations, including the excessive compensation taken by Robertson, Fleury and entities under their control.

29.  By making such false representations and omissions of fact about the Crupe Framing business, Robertson with upon information and belief, the assistance of Bihrer, induced plaintiffs to invest even further in A-1 Preference shares of CRUPE.

<u>Wrongful Transfer of Collateral for CRUPE Financing</u>

30.  In October 2012 Robertson had previously induced Eighteen Seventy, with upon information and belief, the assistance of Bihrer, to loan CRUPE $2,000,000 in effect by providing collateral for a credit facility at UBS.  The loan was accompanied by attached warrants to exercise into A-1 Preference Shares of CRUPE.  In September 2014, suddenly claiming that CRUPE was facing insolvency, Robertson induced Eighteen Seventy to provide another $700,000 in collateral for the credit facility and to invest another $300,000 in CRUPE A-1

Preference shares.  The $700,000 investment was accompanied by attached warrants to exercise into A-1 Preference Shares of CRUPE.  Eighteen Seventy only agreed to the original and additional financing because Robertson with Bihrer's knowing assistance gave written assurances in the loan agreement that it was secured by the shares of all the Company's subsidiaries, which included CRUPE IP, which held the IP.  Robertson and Bihrer did not disclose to Eighteen Seventy that before it agreed to put up collateral for the UBS credit facility in October 2012, they had already conspired and planned to steal the IP from CRUPE IP by transferring it to the CRUPE Foundation.  They and the other defendants did just that in January 2013.  They did not disclose any of these material facts (a) to Eighteen Seventy before it (i) agreed to the increase in the credit facility in October 2014, and (ii) before it agreed to make its other investments described herein; or to (b) Marie Kennedy Foundation and Kennedy before they made their investments described herein.  It was only later that Eighteen Seventy and the other plaintiffs discovered that the defendants had stripped away Eighteen Seventy's collateral with the result that when the loans went into default, they were not secured by the shares of CRUPE IP, the subsidiary holding the IP, as committed in the loan agreement.

<u>Wrongful Transfer of Funds</u>

31.  As an express condition for providing the additional $700,000 in financing and investing $300,000 in additional CRUPE A-1 Preference Shares, Eighteen Seventy required and received Robertson's agreement that he would not make any further payments to East Pacific or any other offshore companies until the Company became profitable.  It was in reliance on that agreement and the resulting financial projections provided by Robertson that Eighteen Seventy agreed to restructure the earlier credit facility for $2,000,000 as well as provide another $700,000 for that facility and invest $300,000 in more CRUPE A-1 Preference Shares.

32.  Nevertheless Robertson almost immediately transferred $600,000 from the Company to East Pacific and other offshore companies controlled by him.  It became apparent from his actions that Robertson never intended to honor his commitment to cease such transfers until CRUPE became profitable, and that he had acted fraudulently from the beginning in inducing Eighteen Seventy to provide the additional financing.  Robertson failed in his obligation to make full disclosure to Eighteen Seventy, in connection with his offer and sale of securities, of his intent not to abide by his representations, and his violation of them.

<u>Continuing Conduct Damaging Plaintiffs</u>

33.  As indicated above, Eighteen Seventy and the Marie Kennedy Foundation made further loans totaling $305,000 in 2015 and 2016.  During that time period, Defendants did not disclose to the plaintiffs the full scope of their conspiracy to defraud plaintiffs by not only transferring the CRUPE IP to the CRUPE Foundation, but also converting it to their own use for the purpose of competing with CRUPE itself, thereby destroying its business and the value of the plaintiffs' investments.  In short, the defendants failed to disclose that they had planned and were engaged in what is commonly referred to as a "bust out scheme."

<u>FIRST CLAIM FOR RELIEF</u>
(Common Law Fraud against All Defendants)

34.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 33 hereof as though fully set forth herein.

35.  The defendants made numerous false representations and omissions of material fact as described herein knowingly and with intent to defraud the defendants by

inducing them to invest in CRUPE shares and CRUPE Framing debt (together "CRUPE securities).

36.   The plaintiffs justifiably relied upon the false representations and omissions of material fact in investing in CRUPE securities.

37.   It was a direct and proximate result of the plaintiffs' reliance upon defendants' false representations and omissions of material fact that the plaintiffs suffered damages in the investment in CRUPE securities.

## SECOND CLAIM FOR RELIEF
(Negligent Misrepresentation against All Defendants)

38.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 33 hereof as though fully set forth herein.

39.   The defendants knew or reasonably should have known that they made numerous false representations and omissions of material fact regarding investments in CRUPE securities, and did so with the intent to defraud the plaintiffs by inducing them to invest in CRUPE securities.

40.   The plaintiffs justifiably relied upon the false representations and omissions of material fact in investing in CRUPE securities.

41.   It was a direct and proximate result of the plaintiffs' reliance upon defendants' false representations and omissions of material fact that the plaintiffs suffered damages in the investment in CRUPE securities.

## THIRD CLAIM FOR RELIEF
(Violation of Section 10(b) and Rule 10b-5 against Defendants
Robertson, East Pacific, Bihrer and Bihrer Law Firm)

42.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 33 hereof as though fully set forth herein.

43.  This claim for relief is based upon Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

44.  The defendants directly engaged in a common plan, scheme and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, practices and courses of business which operated as a fraud and deceit upon the plaintiffs, and made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to the plaintiffs.  The purpose and effect of the scheme, plan and unlawful course of conduct was, among other things, to induce plaintiffs to invest in CRUPE securities.

45.  The defendants, pursuant to this scheme, plan and unlawful course of conduct, knowingly and recklessly, without regard for their truth or falsity, and with intent to defraud the plaintiffs issued, caused to be issued, and participated in the preparation and issuance of deceptive and materially misleading statements as described herein.

46.  The defendants committed the fraud to enrich themselves at the expense of plaintiffs.

47. Plaintiffs justifiably relied upon defendants' false representations and omissions of material fact in investing in CRUPE securities.

48.  It was a direct and proximate result of the plaintiffs' reliance upon defendants' false representations and omissions of material fact that the plaintiffs suffered damages in the investment in CRUPE securities.

49.  The defendants have therefore violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder because they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of conduct which operated as a fraud and deceit upon the plaintiffs in connection with their investment in CRUPE securities.

<u>FOURTH CLAIM FOR RELIEF</u>
(Violation of Florida Blue Sky Laws, Fla. Stat. § 517.301 against Defendants Robertson, East Pacific, Bihrer and Bihrer Law Firm)

50.  Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 33 hereof as though fully set forth herein.

51.  The defendants directly engaged in a common plan, scheme and unlawful course of conduct, pursuant to which they engaged in transactions, acts, practices and courses of business which operated as a fraud and deceit upon the plaintiffs.  Defendants knew or should have known that they made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to the plaintiffs.  The purpose and effect of the scheme, plan and unlawful course of conduct was, among other things, to induce plaintiffs to invest in CRUPE securities.

52.  The defendants, pursuant to this scheme, plan and unlawful course of conduct, and with intent to defraud the plaintiffs, issued, caused to be issued, and participated in the preparation and issuance of statements that they knew or should have known were deceptive and materially misleading, as described herein.

53.  The defendants committed the fraud to enrich themselves at the expense of plaintiffs.

54.  Plaintiffs justifiably relied upon defendants' false representations and omissions of material fact in investing in CRUPE securities.

55.  It was a direct and proximate result of the plaintiffs' reliance upon defendants' false representations and omissions of material fact that the plaintiffs suffered damages in the investment in CRUPE securities.

56.  The defendants have therefore violated Fla. Stat. § 517.301 because they (a) employed devices, schemes and artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or omissions of material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, acts, practices and a course of business which operated as a fraud and deceit upon the plaintiffs in connection with their investment in CRUPE securities.

WHEREFORE, the plaintiffs request the following;

a.   Compensatory, consequential and general damages in an amount to be determined at trial, but in no event less than $10,688,000;

b.   Costs and disbursements incurred in the prosecution of this action;

   c.     Pre-judgment and post-judgment interest on any award;

   d.     Reasonable attorneys' fees; and

   e.     Such other and further relief as is just and proper.

### JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable.

Dated:  December 15, 2016

                        HUGHES HUBBARD & REED LLP

                        By:   /s/Aviva L. Wernick
                              Aviva L. Wernick
                              Florida Bar No. 0697281
                              aviva.wernick@hugheshubbard.com

                        201 South Biscayne Boulevard
                        Miami, Florida 33131-4332
                        Telephone:  (305) 358-1666
                        Fax:  (305) 371-8759

                        Edward J.M. Little
                        One Battery Park Plaza
                        New York, New York 10004-1482
                        Telephone:  212-837-6400
                        Fax:  212-299-6400
                        edward.little@hugheshubbard.com

                        *Attorneys for Plaintiffs*